## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AT&T, a New York corporation, | ) | |
| | ) | |
| **Plaintiff,** | ) | **8:04CV296** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ASHA DISTRIBUTING, INC., a** | ) | **MEMORANDUM AND ORDER** |
| **Nebraska corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

This matter is before the magistrate judge pursuant to 28 U.S.C. § 636 and the consent of the parties.  A trial to the court was held on May 24-25, 2005.  The parties submitted proposed findings of fact and conclusions of law, and the matter was deemed submitted for decision on July 21, 2005.

## I.  INTRODUCTION

The defendant ("ASHA") is a wholesale distributor of heating and air conditioning equipment. Between 1995 and 2003, ASHA purchased telecommunications services and maintained at least three separate service accounts with the plaintiff ("AT&T"):  a private line account, a long distance account, and a managed internet services account.

Based on theories of breach of contract and *quantum meruit*, AT&T seeks to recover charges of $132,457.43 for services it provided under the long distance and private line accounts.  ASHA contends it was overcharged for long distance services and that charges should not have accrued on the private line account because ASHA asked AT&T to disconnect or discontinue services on that account.

## II.  JURISDICTION AND VENUE

AT&T is a corporation organized and existing under the laws of New York with its principal place of business located in Bedminster, New Jersey, and is authorized to do business as a foreign corporation with the State of Colorado.  ASHA is corporation organized and existing under the laws of the State of Nebraska with its principal place of business in Douglas County, Nebraska.

This court has jurisdiction pursuant to 28 U.S.C. § 1332, as the action is between citizens of different states and the amount in controversy exceeds $75,000.  Venue is proper in the District of Nebraska.

### III.  FINDINGS OF FACT

#### A.   ASHA's Long Distance and Private Line Accounts

ASHA was using AT&T services when its president,  Trace Smith, bought the company in 1995.  At that time, ASHA had six stores.

ASHA maintained a "Long Distance Account," No. 0192796770001, for MEGACOM 800 toll-free service and for long distance services.  ASHA's original contract for long distance services expired in 1999.

In 1997 or 1998, AT&T and ASHA entered into a contract for private line data telecommunications services.  This contract expired at the end of January 2001.  AT&T billed the private line service (the "Private Line Account") under account No. 80017764574.[1]  The Private Line Account consisted of:

- Three (3) AREC circuits or data lines that ran from ASHA's branch offices to its main office in Omaha, and

- One (1) DHEC circuit for voice services.

The AREC circuits were installed so that ASHA could transfer data among its growing number of stores.

---

[1]Neither party could find copies of any contracts establishing the Long Distance Account and the Private Line Account.  AT&T's customer sales and service specialist, Teresa Dyar, constructed the terms of original contracts from other records and testified quite credibly as to their contents.

**B.  AT&T Contracts**

*1.  Components and Format*

According to AT&T customer sales and service specialist Teresa Dyar, it is the company's policy to enter into written contracts with its business clients, and these contracts are set up in a specific format.  The first essential component is a "Master Agreement" which sets the length of the contract and the general terms of doing business between AT&T and the customer.  For example, while a Master Agreement does not govern the rates or terms with regard to the components of a service, it does govern the procedure for making and accepting payments, how disputes will be handled, who the customer should contact, time frames, regions, and choice of law.   An executed Master Agreement is assigned a specific contract number.

The second essential component of an AT&T business contract consists of one or more "Service Order Attachments" to the Master Agreement identifying in detail the types of services the customer will receive.  AT&T will not install components or implement new rates without a Service Order Attachment.  There are multiple variations of this form, depending on the services requested. For example, the Service Order Attachment for a voice contract would describe the services to be provided, the functioning of those services, identify the base rates and any discounts or promotions, confirm the customer's annual revenue commitment, set the term of service (24 months, 36 months, etc.), and provide for installation.

*2.  Expiration*

Generally, the customer loses any discounted rate when a Service Order Attachment expires, and the account defaults to certain base rates, i.e., tariff rates or uncontracted base rates published in the AT&T Service Guide.  A tariff rate is a flat, undiscounted rate and is the highest rate AT&T can charge.  The tariff rates are subject to approval by the FCC and are published in the AT&T Service Guide.  According to Dyar, the AT&T Service Guide has generally replaced the tariff rates. The Service Guide is posted on AT&T's web site.

All AT&T invoices give warnings when the customer's contract is going to expire. Generally, a customer will receive at least two warnings that the contract is about to expire and that they need to call AT&T.  Once a customer is "off contract," or their contract expires, the customer

is notified via invoice that the customer's account is now subject to the terms of AT&T's general "Business Service Agreement," which is similar to a Master Agreement about where the customer can call to get information from AT&T. For example, ASHA's July 19, 2002 invoice from AT&T (Exhibit 15) is prominently captioned "AT&T Business Service" on each page and gives a number to call for "Customer Care." Page 4 of the invoice advises where the customer, ASHA, could obtain information about the Business Service Agreement and pricing:

> Beginning with bills rendered on or after July 1, 2002 the Universal connectivity Charge will be reduced from 10.6% to 9.6%. AT&T values your business and evaluates prices on a recurring basis.
>
> The terms, conditions and charges that apply to all your detariffed AT&T services can be viewed at the AT&T web site: http://www.att.com/business/agreement. Important limits of liability apply, including: AT&T is not liable for indirect or consequential damages (such as your lost profits or other economic loss) and direct damages during any 12 months cannot exceed one month of your payments for affected service.
>
> Additional terms, conditions, charges and price change information for all detariffed business services can be viewed at http://www.att.com/serviceguide/business. Price changes will be posted at this AT&T web site before they apply to your bill. If you do not have access to the Internet, please contact your AT&T Sales Representative or Customer Care Center for information.

The invoices included in Exhibit 15 indicate that ASHA was receiving a "Simple Pricing Option Discount" of 28.00% for long distance service. Teresa Dyar explained that ASHA had been on a contract that, at one point, gave it a 48 percent discount. When that contract expired, ASHA's account was "grandfathered" into the Simple Pricing Option, which gave ASHA a 28% discount off the base tariff fee for long distance services. Dyar described the Simple Pricing Option as a base plan maintaining a discount for customers who have "fallen off a contract."

### 3. *The Business Service Agreement*

The version of the Business Service Agreement posted on September 30, 2004 (Exhibit 13) provides that the customer's use of the AT&T services provided under the agreement constitutes acceptance of the terms of the agreement. If the customer disagrees with the terms of the Business Service Agreement, the customer should not use the service and should immediately contact an

AT&T customer care center or sales representative to cancel the service.  The customer is responsible for reimbursing AT&T for all costs, including reasonable attorney fees, associated with collecting delinquent or dishonored payments.  If AT&T does not receive payment by the due date, the customer may be charged interest on any unpaid balances at the rate up to one-and-a half percent per month or the maximum rate allowed by law.  State law issues concerning the construction, interpretation and performance of the Business Service Agreement "shall be governed by the substantive  laws of the State of New York, excluding its choice of law rules."  The terms of the Business Service Agreement have not changed significantly since  July 1, 2002.

### 4.  Requests to Disconnect Service

Turning to disconnection of service, AT&T requires that all requests to disconnect service be made in writing and with 30 days advance notice to AT&T.  The customer bears the responsibility of giving AT&T written notice of when they want their services disconnected.  The written request may be delivered to anyone at AT&T, at which time it would be scanned into a system known as "Doc Viewer" and then reviewed by anyone at AT&T who is involved in the disconnect process.  AT&T has 30 days to implement the request for disconnection.  As Dyar explained, AT&T has no control over what the customers do in their own offices, such as unplugging the telephones.  Each customer uses actual physical assets owned by AT&T, and the assets are reserved for customers until the customer notifies AT&T it can reclaim that asset and reuse it for someone else.  The requirement of a written request also protects AT&T from liability issues which may arise if it disconnected someone who did not want to be disconnected.

### C.  Negotiations for Managed Internet Services and Voice Services

By 2001, ASHA's business had grown to 10 stores, and ASHA had outgrown the old frame relay data transfer system maintained under the Private Line Account.  Because the frame relay system was costly and unstable, it was suggested that ASHA convert to a virtual private network ("VPN"), using the Internet.

In the fall of 2001, Trace Smith hired Greg Newbold as ASHA's Information Technology Manager.  Newbold was assigned to evaluate ASHA's telecommunications services and provide a cost savings analysis.  Newbold believed that a VPN system would be cost effective and that ASHA was being overcharged for voice services.  Thus, Trace Smith and Greg Newbold began negotiating

with AT&T and other companies for both managed internet services and voice services. ASHA wanted a package deal. During their negotiations, the discontinuation and disconnection of the old frame relay system was discussed extensively.

ASHA and AT&T reached an agreement for managed internet services and signed Master Agreement No. 33025 (the "MIS Contract"). The MIS Contract (Exhibit 2) became effective on November 29, 2001, when it was executed by AT&T, and consisted of the Master Agreement, a Service Order Attachment for internet transport services, a pricing schedule for managed internet services, and an order pricing page indicating that ASHA had ordered Managed Internet Service with Managed Router for a 24-month period at $886.50 per month (reflecting a 55% discount), plus a local access facility charge of $170.00, for a total monthly charge of $1,056.50. The MIS contract contains no provision that ASHA's three AREC circuits would be cancelled.

After the MIS Contract was signed, ASHA continued negotiating with AT&T for a voice contract. Apparently, the negotiations for a voice services contract began around October 2001. On October 24, 2001, AT&T's sales representatives, Arnaud Delobel and Kirk McKinney, forwarded a price quote for long distance services to Trace Smith along with the final draft of the MIS Contract (*see* Exhibits 110 & 111).

Newbold thought the October proposal was too high. On or about December 6, 2001, ASHA received a proposed contract (Exhibit 7[2]) from AT&T for long distance, local toll, local, and cellular services (the "proposed Voice Contract"). Trace Smith authorized Newbold to sign this document on behalf of ASHA. Newbold signed the document, but did not date it. Newbold then returned the contract to AT&T for its approval and execution. ASHA did not ever receive an executed copy of the proposed voice contract from AT&T, and AT&T has no record that such a contract ever existed. Newbold himself admitted that he did understand he needed to sign a written contract to get the rates he was being quoted for long distance service and acknowledged he had not received a signed copy of the proposed Voice Contract. Nevertheless, ASHA continued to use the long distance services provided by AT&T, up to June or July 2003.

---

[2]Exhibit 103 is the same document as Exhibit 7, and counsel referred to both exhibits during the trial; however, only Exhibit 7 was received in evidence.

Turning to the document itself, the first page of the proposed Voice Contract (Exhibit 7) is a Master Agreement form signed by Grant Newbold. The form was not countersigned by AT&T and does not have any Master Agreement reference number at the top. The accompanying Service Order Attachment and Nondisclosure Agreement were not completed and were not signed by anybody. No term period is specified in the document, and the components are not specifically listed. The last two pages of the proposed Voice Contract consist of an illustrative rate sheet for "T1.5 Access (SINA Voice Data)" and an illustrative rate guide dated November 12, 2001, showing possible long distance rates for different types of services. These pages are not in the format of any pricing schedule typically included in a standard AT&T contract and appear to be promotional materials. The document did not address inbound toll-free service or ASHA's existing MEGACOM 800 Service.

### D.  Installation of the VPN

It took about one month to implement the MIS Contract, and the VPN was successfully installed in mid-January 2002. ASHA's frame relay system was converted to the VPN over a weekend. During the conversion, Newbold worked with two AT&T technicians and the "MIS people" at AT&T. Newbold was informed that AT&T had a cancellation department and was instructed to write a letter and fax it to AT&T to cancel the old service. Newbold testified he did fax a request for cancellation to AT&T in mid-January, but he did not retain a copy. AT&T has no record of receiving any written request to disconnect ASHA's three AREC data lines that were used in the old frame relay system.

### E.  Billing after January 2002

After the successful installation of the VPN in January 2002, AT&T continued to bill ASHA for the three AREC circuits on the Private Line Account, No. No. 80017764574. Although Newbold testified that he did send a letter to AT&T advising that ASHA should not continued to be billed for the AREC circuits, he did not retain any documentation to that effect.

ASHA complained repeatedly to AT&T that it was not being properly billed. ASHA was told to pay the invoices, the problem would be fixed, and ASHA would be credited.

ASHA's billing dispute over the Private Line Account was initially referred to Lisa Ray, a credit representative in AT&T's Mesa, Arizona, Revenue Assurance Management (RAM) facility.[3] On or about April 19, 2002, Ray sent a letter (Exhibit 112) to ASHA's accounts payable clerk, Lisa Smith, confirming the resolution of the dispute: "Specifically, we have agreed that AT&T will apply a $125,757.41 credit to account number 8001-776-4574 in order to resolve this dispute.  In return Asha [sic] Distributing releases AT&T from any future liability associated with this dispute."  Ray's letter characterized the agreement as an "adjustment for February 1998 through April 2002 billing." The Settlement Agreement itself (Exhibit 13) reflects that the dispute pertained to "certain tariffed charges ... prior to LAST DAY OF DISPUTE April 30, 2002."  Unbeknownst to ASHA, Lisa Ray had no authority to enter into such a settlement on behalf of AT&T and ASHA continued to be billed in full for the AREC circuits which had been rendered obsolete by the installation of the VPN in January 2002.

ASHA paid its long distance bill in full through the June 2002 invoice, as AT&T had agreed to the $125,757.41 credit (on the Private Line Account) and had advised ASHA that the billing problems would be corrected.  The problem was not corrected, so Newbold directed that ASHA cease payments on the account.

The signed release/settlement agreement (Exhibit 108), which had gone through several revisions, was signed and forwarded to Lisa Ray by Lisa Smith by letter dated July 10, 2002 (Exhibit 109).  Smith's letter referred specifically to the Private Line Account, No. 80017764574, and advised Ray that ASHA was being overcharged by several thousand dollars each month and that ASHA had been "quoted a price of $200.00 per month as of January 1, 2002 for the remaining circuits we are using."  Smith requested that the $125,757.41 credit be applied to the Private Line Account.

ASHA continued to be billed in full for all the circuits on its Private Line Account.  It did not pay the invoices and, in August 2002, the account was assigned to Teresa Dyar, a RAM customer sales and service specialist based in Minneapolis.  At the time, Dyar was not advised and was

---

[3]AT&T's Revenue Assurance Management (RAM) division performs collections and manages disputes.

unaware that ASHA had entered into the MIS Contract.[4]   Dyar was able to verify that ASHA's contract for its Private Line Account had expired and the account was billing at base rates.

Lisa Smith left the employ of ASHA in July 2002 and was replaced by Cindy Collister. Teresa Dyar contacted Cindy Collister at the end of August 2002 regarding the Private Line Account. Collister told Dyar that ASHA had been having problems with the Private Line Account for "quite some time" and ASHA had negotiated a settlement agreement with Lisa Ray of AT&T in Mesa. Collister said she was very frustrated.  Collister said she thought ASHA should be billed for two circuits and complained that the circuits were being billed off-contract.  Dyar agreed to put the entire account in dispute until they could reach a resolution and asked Collister to forward all documentation.  Collister responded that ASHA had already sent things in and would not be sending them again; however, she did send Dyar a copy of the release and settlement.

The settlement agreement had already been forwarded to Dyar with the information that was in Lisa Ray's file.  The agreement had not been completely executed on the part of AT&T in that the credit had not actually been approved and applied to the Private Line Account; however, the credit was pending in the billing system.  The credit was delayed because AT&T's standard procedures were not used in negotiating the settlement.  One such procedure is to resolve the underlying problem.  Lisa Ray had not resolved the underlying problem, i.e., the rate dispute.  Thus, Dyar began negotiations to get ASHA on a new contract so that ASHA's rates would be correct going forward.

Meanwhile, on August 20, 2002, Cindy Collister sent a certified letter (Exhibit 106) to AT&T representatives Christopher White, Jennifer Haven, and  Lisa Ray concerning both the Private Line Account and the Long Distance Account.  The letter was composed by Grant Newbold and advised the recipients that ASHA had not been receiving the "intended" telephone rates for the Long Distance Account since December 1999.  The August 20 letter further advised that ASHA had signed the MIS Contract for $1056.50 per month and that the MIS Contract had cancelled all the lines on the Private Line Account.  Collister's letter further stated that ASHA agreed to sign the MIS Contract "with the conditions that we would receive a new contract for a voice T1, new long distance rates,

---

[4]Dyar did not independently discover the existence of the MIS Contract because she had not been given access to AT&T's MIS accounts. Remarkably, Dyar did not become aware of ASHA's MIS account until she was deposed in 2005. She acknowledged that it would have been important for her to know whether there was a master service agreement in place with respect to the MIS account.

-9-

and a credit for $125,757.41" on the Private Line Account.  Based on Grant Newbold's calculations, Collister asserted that AT&T owed ASHA a credit balance of $36,058.05.  She further complained that the $125,757.41 credit had not yet been applied to the Private Line Account.

Significantly, Collister did not send this letter to Teresa Dyar, even though Dyar had instructed Collister to send all documentation regarding ASHA's billing dispute directly to Dyar. Nor did anyone within AT&T forward Collister's letter to Dyar.[5]  Had Dyar received this letter, she would have immediately advised ASHA to send her written notification of the specific circuits on the specific account they wanted disconnected.

The August 20, 2002 letter constitutes Newbold's only documentation of his telephone conversations with AT&T and the only document indicating that ASHA had any dispute with AT&T regarding its long distance rates.  In calculating the what he believed to be the correct charges, Newbold "went back as far as I could to where I could see a point where I felt ASHA was getting hosed."  That point was December 1, 1999.

On or about September 6, 2002, AT&T's billing system generated a letter to ASHA regarding the balance due on the Private Line Account and notifying ASHA that its services would be restricted if ASHA did not remit payment of $15,723 by September 16, 2002. The letter reflected an amount in dispute of $125,757.41 and a total amount due of $141,480.71.  Teresa Dyar explained to Cindy Collister that this letter was sent in error and confirmed that the Private Line Account was not scheduled to be disconnected.

ASHA continued to have problems with its AT&T accounts.  In an e-mail message dated November 9, 2002 (Exhibit 117), Cindy Collister advised AT&T representative Amy Velarde that she had received a call "regarding that our account #019-2797-6770-001 [the Long Distance Account] was going to be shut off due to non-payment."  Collister explained that she had not yet

---

[5]Grant Newbold testified that the August 20, 2002 letter was sent by certified mail to individuals Cindy Collister had been talking to.  Exhibit 107 consists of return receipts showing that an article addressed to Lisa Ray was received by another individual in Mesa, Arizona, and an article addressed to "AT&T Growth Market" in Syracuse, New York was received by one Christina Nichols. There are no article numbers on the receipts linking them to any particular items.

-10-

received any calls from any AT&T sales people and requested that both the Private Line Account and the Long Distance Account be placed in dispute until a representative could come out to ASHA.

Meanwhile, Teresa Dyar continued to work on the problems with ASHA's Private Line Account. Dyar had advised ASHA from the beginning, when she realized their private line was off contract, that ASHA needed to get a contract negotiated and needed to get in touch with sales. Dyar and ASHA had minimal success in getting any of AT&T's sales representatives to timely contact ASHA with proposals for new contract rates.

ASHA's Long Distance Account was assigned to Dyar in 2003 for dispute resolution. Her communications to persons within AT&T reflect her substantial frustration with the performance of AT&T's sales and collections representatives in renegotiating ASHA's accounts.

In late January 2003, Cindy Collister advised Dyar that ASHA had not been contacted to set up a new contract for voice and data services. Dyar conveyed that information by e-mail (Exhibit 157) to sales Account Executive Bryan Vauls. She identified ASHA as the account she received from Mesa "that had a $126K R&S signed, but after AT&T Legal reviewed the documents they recommended that we get the customer on a contract before adjusting since the customer signed the R&S under duress (threat of service interruption if they didn't sign)." Dyar also noted that Amy Velarde in Sales had stopped communicating with her once she told Velarde that ASHA was not leaving AT&T. Dyar inquired, "Is there anything we can do to get someone from Sales to contact this customer! They have been dealing with this issue for over four years and they really would like a new contract and the past due resolved on their accounts." Vauls forwarded this information to James Etienne, advising that ASHA needed a new contract "ASAP." Vauls' message stated he had opened a dispute in December, but they have not paid a bill in 8 months so RAM is about to cut them off."

On April 15, 2003, Dyar sent e-mail messages (Exhibit 156) to sales representatives Jeff Altier and John Dowhy advising them that ASHA had received a call the previous day that their services were to be restricted for nonpayment. Cindy Collister had called Dyar "in a panic" on April 15, upset that AT&T was "doing it to ASHA again!" Dyar advised the recipients that she and Dowhy were trying to get ASHA to sign a new contract and a release and settlement agreement. Dyar's message notes that

-11-

> [t]hey have been without a contract for years (AT&T dropped the ball multiple times) and the dispute I have for the [Private Line Account] (8001-776-4574) originated in Mesa RAM where the customer was coerced to sign a invalid R&S without an offer of a new contract to fix the billing issues.
>
> The dispute for the [Long Distance Account] (0192796770001) was closed by Mesa RAM after one month in because "it was open too long" and now they want payment or they will disconnect.  As per AT&T Legal instructions, we are trying to get a new [contract] signed so we can legitimately do the re-rates on both accounts.  The collections representative won't assist in referring the account to have a dispute opened; she will only stop the restriction if a $25K payment is made today....

Dyar sought immediate assistance in opening a dispute on the Long Distance Account and advised that ASHA was unwilling to accept AT&T's word that it would fix the Long Distance Account after a new contract was signed.  Collister wanted a release and settlement for the Long Distance Account.  Dyar would need to incorporate the amount owed/due on that account into the existing settlement agreement for the Private Line Account, or a second settlement agreement would need to be created, or ASHA would not sign it.  "The customer just wants a correct bill.  They are tired of being told it will be fixed some day."

In May 2003, Dyar received information from Greg Newbold that ASHA had three circuits he had wanted disconnected.  When Dyar asked him which three, Newbold could not provide a response, so Dyar asked him to fax or e-mail her all the documentation regarding those circuits.  Newbold sent her a group of documents, none of which indicated they wanted the circuits disconnected.  Not until May 28, 2003 did ASHA actually tell Dyar that it did not want a rerate for the four circuits in the Private Line Account, but wanted a full credit.

With respect to the settlement of the Private Line Account, Dyar had to obtain approval of the settlement agreement from AT&T's legal department and from other departments because Lisa Ray had failed to do so.  Dyar could find no foundation for the credit; that is why it took her so long to get it approved.  It was eventually processed as an efficiency adjustment and the Private Line Account was credited $125,757.41 on June 4, 2003.  The credit appears on the July 1, 2003 invoice.  *See* Exhibit 16 at 0208.

In May 2003, ASHA switched telecommunications providers and entered into a voice contract with McLeod.  It took a month and a half to implement the McLeod contract at which time

ASHA cancelled its AT&T voice services.  The MIS Contract continued for a while, but there was never any dispute over the MIS Contract; it worked well and all the bills were timely paid.

In late 2003, AT&T proposed to ASHA a new ABN contract.  According to Trace Smith, AT&T was "just going to ... credit us for all the old account or all what they had billed us for if we would sign a new contract which we didn't."

## IV.  CONCLUSIONS OF LAW

### A.  Choice of Law

Based on the highly credible testimony of Teresa Dyar that it is AT&T's practice to enter into written contracts with its business partners, that ASHA's original contract for long distance service expired in 1999, that ASHA's original contract for private line services expired at the end of January 2001, and that both accounts defaulted to the terms of AT&T's general "Business Service Agreement" upon the expiration of their original terms, I find that the terms of the Business Service Agreement (Exhibit 13) apply to the accounts at issue in this case.  Accordingly, any state law issues concerning the construction, interpretation and performance of the Business Service Agreement "are governed by the substantive  laws of the State of New York, excluding its choice of law rules."  Ex. 13 at p.6.

"Under New York law, a breach of contract claim has four elements: '(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.' *Ledain v. Town of Ontario,* 192 Misc. 2d 247, 746 N.Y.S.2d 760, 763 (N.Y. App. Div. 2002)." *Fulcrum Fin. Advisors, Ltd. v. BCI Aircraft Leasing, Inc.*, 354 F. Supp. 2d 817, 825 (N.D. Ill. 2005); *see also AT&T Corp. v. Firmware of Minnesota, Inc.*, Civ. 02-1010, 2004 WL 112632 at *2 (D. Minn. 2004).

### B.  The Long Distance Account

As discussed above, AT&T contends ASHA breached its agreement to pay for long distance services provided by AT&T on the Long Distance Account, No. 0192796770001, as evidenced in its invoices dated July 19, 2002 through October 14, 2003.  (*See* Exhibit 15).  ASHA contends that AT&T's invoices were incorrect as to this account, that it had been overbilled since December 1,

1999, and that it entered into a new contract, i.e., Exhibit 7, with AT&T for long distance services in December 2001.

I find that AT&T has proven by a preponderance of the evidence that ASHA's original contract for long distance services expired in 1999, at which time the Long Distance Account became subject to the terms of the Business Service Agreement and defaulted to the tariff rates or uncontracted base rates published in the AT&T Service Guide.  As is AT&T's practice regarding expired contracts of this type, ASHA was given a courtesy "Simple Pricing Option Discount," i.e., a lesser discount of 28% for long distance service in place of the expired discount.

Turning to the question of whether AT&T and ASHA entered into a new long distance contract in December 2001, "[i]n order for a breach of contract to exist, there must be a meeting of the minds on the agreement said to have been breached.  Mutual assent evincing the intention of the parties to form a contract is essential, and without it, a party may not be held to the contract." *Gomez v. Bicknell*, 302 A.D.2d 107, 116, 756 N.Y.S.2d 209, 216 (N.Y. App. Div. 2002).  In this case, there is no evidence that AT&T ever countersigned, approved, or otherwise accepted the terms of Exhibit 7.[6]  Newbold and ASHA's other representatives were fully aware that they needed a signed contract to get better discounted rates and that they had not received any countersigned copy of this document, yet they took no constructive action to procure a signed contract after December 2001.  With this knowledge, ASHA continued to use the long distance services provided by AT&T.  ASHA's continued use of the long distance services provided under the Business Service Agreement constituted its acceptance of the terms of that agreement.

I find that Exhibit 7 does not constitute a valid contract and that  AT&T and ASHA did not enter into a new contract for long distance services in December 2001 or thereafter.  From the time its original long distance contract expired until the time it closed the account,  ASHA continued to use long distance services provided by AT&T pursuant to the terms of the Business Service Agreement at the rates reflected on the invoices.  In the absence of any evidence to the contrary, I find that ASHA was correctly billed for long distance services and is liable to AT&T in the amount of $61,797.40 on the Long Distance Account.

---

[6]The court assumes, without deciding, that this document was forwarded to AT&T by Grant Newbold in December 2001.

## C.  The Private Line Account

To recap, ASHA's Private Line Account consisted of three AREC circuits or data lines and DHEC circuit for voice services and was an account separate from the Long Distance Account. AT&T alleges an amount due of $86,563.88 on ASHA's Private Line Account, No. 80017764574, for private line services rendered after April 30, 2002.  *See* Exhibits 16 & 108.

The major issue presented as to this account is whether or when ASHA provided written notice to AT&T that it wished to discontinue this service, which was maintained largely – but not entirely – to support ASHA's frame relay data transfer system.  Trace Smith and Grant Newbold testified, credibly, that AT&T's representatives were aware that the three AREC circuits on the Private Line Account were to be discontinued and disconnected after ASHA's new VPN was installed.  Indeed, the purpose of the VPN was to eliminate the cost and inefficiency of maintaining the frame relay system, and the issue was discussed extensively during negotiations for the MIS Contract.

In this context, and despite Mr. Newbold's unfortunate failure to keep any written record, I find Newbold's testimony that he faxed a request for cancellation to AT&T in mid-January 2002 to be credible.  The VPN was successfully installed at that time, and ASHA would have no interest in maintaining the three AREC circuits after the installation was completed.  Considering AT&T's equally unfortunate failure to maintain many of the vital records involving ASHA's accounts, it is a fair inference that Newbold's request for cancellation of the three AREC circuits was lost or misdirected within AT&T.  Taking into account the standard 30-day notice period, I find that ASHA was liable for service on the three AREC circuits on the Private Line Account through the month of February, 2002.  Its account was paid in full through that date due to the $125,757.41 release and settlement of the Private Line Account, which settled the entire account through April 30, 2002.

There is no evidence, however, that ASHA cancelled service in January 2002 for the remaining DHEC circuit for voice services on the Private Line Account.  The invoices in Exhibit 16 show that charges of $21,187.61 accrued on the DHEC circuit between May 1, 2002 and the time ASHA formally cancelled all of its voice services with AT&T.  Based on testimony that ASHA entered into its voice contract with McLeod in May 2003, and it took a month and a half to implement the McLeod contract, I conclude that ASHA is liable for its use or reservation of the

DHEC circuit on the Private Line Account through the July 1, 2003 invoice, in the amount of $21,187.61.

### D. *Quantum Meruit*

The existence of a valid and enforceable contract governing a particular subject matter ordinarily precludes recovery in *quantum meruit* or quasi-contract for events arising out of the same subject matter. *American Tel. & Util. Consultants, Inc. v. Beth Israel Med. Ctr.*, 307 A.D.2d 834, 835, 763 N.Y.S.2d 466 (N.Y. App. Div. 2003). Plaintiff's claim for damages in *quantum meruit* must fail because, as discussed above, a valid and enforceable contract (the Business Service Agreement) existed which covered both the Long Distance Account and the Private Line Account. In any event, ASHA was not unjustly enriched by the presence of the three obsolete AREC circuits (which AT&T continued to provide month after month despite its own installation of the VPN which rendered the circuits obsolete).

### DECISION

In summary, ASHA's original contract for long distance service expired in 1999, ASHA's original contract for private line services expired at the end of January 2001, and both accounts defaulted to the terms of AT&T's general "Business Service Agreement" upon the expiration of their original terms.

Contrary to ASHA's contentions, the parties did not enter into a new contract for long distance services in December 2001 or thereafter. ASHA continued to use the long distance services provided by AT&T under the Business Service Agreement and is liable to AT&T in the amount of $61,797.40 on the Long Distance Account.

ASHA timely cancelled its three AREC circuits on the Private Line Account; however, it did not cancel the DHEC circuit for voice services on this account. ASHA is liable for its use or reservation of the DHEC circuit on the Private Line Account through the July 1, 2003 invoice, in the amount of $21,187.61.

Noting AT&T's request for attorney's fees and interest, AT&T is given until **October 25, 2005** to file an application therefor. Any such application shall be accompanied by (a) an Evidence

-16-

Index in compliance with NECivR 7.1(a)(2) providing the basis for calculating such an award and (2) a brief fully setting out the statutory, regulatory, or other authority for entering such an award. If plaintiff does not comply with these requirements, the request for attorney's fees and interest will be deemed abandoned.   ASHA is given until **November 22, 2005** to respond to plaintiff's application, at which time the matter of attorney's fees and interest will be determined and final judgment entered.

  **IT IS SO ORDERED.**

  **DATED September 28, 2005.**

      **BY THE COURT:**

      **s/ F.A. Gossett**
      **United States Magistrate Judge**